Argued and submitted June 27, 2005, reversed and remanded for reconsideration March 15, 2006

Anthony NAKASHIMA,
Greg Nakashima, Esther Nakashima,
Jonny Long, Lee Long, Sue Long, Loren Larry,
Violet Larry, Josh Linfoot, Becky Harvey, Taylor Lewis,
Carlene Lewis, Andrew Bailey, and Susie Bailey,
*Petitioners,*

*v.*

BOARD OF EDUCATION
and Oregon School Activities Association,
*Respondents.*

581-021-0034-4-00; A123878

131 P3d 749

Charles F. Hinkle argued the cause for petitioners. With him on the briefs was ACLU Foundation of Oregon.

Janet A. Metcalf, Assistant Attorney General, argued the cause for respondent Board of Education. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Jonathan M. Radmacher argued the cause for respondent Oregon School Activities Association. With him on the brief was McEwen Gisvold, LLP.

Before Landau, Presiding Judge, and Brewer, Chief Judge,* and Armstrong, Judge.

LANDAU, P. J.

---

* Brewer, C. J., *vice* Richardson, S. J.

## LANDAU, P. J.

This case is before us for the second time. In *Montgomery v. Board of Education*, 188 Or App 63, 71 P3d 94 (2003), petitioners sought review of a decision of respondent Board of Education (the board) concluding that respondent Oregon School Activities Association (OSAA) did not unlawfully discriminate when it declined to adjust the schedule of the Class 2A Oregon State High School Boys' and Girls' Basketball Tournament to ensure that Portland Adventist Academy (PAA) teams would not be scheduled to play on the team members' sabbath. We determined that ORS 659.850[1] required OSAA to attempt to make a reasonable accommodation of the students' religious needs and that, by failing to consider whether OSAA had fulfilled that obligation, the board committed legal error. We therefore remanded the order to the board for reconsideration.

The board has now issued its final order on reconsideration. In that order, the board made supplemental findings of fact and concluded that OSAA established that each of petitioners' proposed accommodations is not reasonable because each would impose an "undue hardship" on OSAA, on its member schools, and on participants in and fans attending the tournament. In reaching that conclusion, the board determined that an "undue hardship" exists if the proposed accommodation imposes more than a *de minimis* cost on OSAA. Because it found that each of petitioners' proposed accommodations would impose more than *de minimis* costs, the board concluded that OSAA did not violate ORS 659.850 in declining to incorporate one or more of those proposed accommodations into the tournament structure.

---

[1] ORS 659.850 provides, in part:

"(1) As used in this section, 'discrimination' means any act that unreasonably differentiates treatment, intended or unintended, or any act that is fair in form but discriminatory in operation, either of which is based on age, disability, national origin, race, marital status, religion or sex.

"(2) No person in Oregon shall be subjected to discrimination in any public elementary, secondary or community college education program or service, school or interschool activity or in any higher education program or service, school or interschool activity where the program, service, school or activity is financed in whole or in part by moneys appropriated by the Legislative Assembly."

Petitioners again seek judicial review, arguing that OSAA's rejection of their proposed accommodations violates ORS 659.850 as well as the guarantees of religious freedom in Article I, sections 2 and 3, of the Oregon Constitution.[2] They do not challenge any of the board's factual findings. We therefore review the board's order for substantial reason and errors of law. ORS 183.482(8). We conclude that the board erred in concluding that an accommodation is unreasonable if it imposes more than *de minimis* costs on the OSAA. Accordingly, we again reverse and remand for reconsideration.

## I. FACTS

A. *Background*

We take the following background facts from our earlier opinion and from the board's order, supplemented as necessary by undisputed facts in the record.

The Class 2A basketball tournament is held in Pendleton and, as of 2004, includes eight boys' teams and eight girls' teams. The games are scheduled as follows: The girls' first-round (quarterfinal) games are held on Wednesday in two double-headers. The boys' first-round games are held on Thursday in two double-headers. A third Thursday double-header consists of two girls' consolation games. On Friday morning there are two boys' consolation games; in the afternoon there is a boys' semifinal game and a girls' semifinal game. On Friday evening there is another boys' semifinal game and another girls' semifinal game. The consolation finals are played in a Saturday morning double-header. The boys' and girls' third-place games are played in a Saturday afternoon double-header. The championship games are played in a Saturday evening double-header with the girls' game being played first at 6:15 p.m. All games are played at the Pendleton Convention Center.

---

[2] Article I, section 2, provides that "[a]ll men [*sic*] shall be secure in the Natural right, to worship Almighty God according to the dictates of their own consciences." Article I, section 3, provides that "[n]o law shall in any case whatever control the free exercise, and enjoyment of religeous [*sic*] opinions, or interfere with the rights of conscience."

In 1996, PAA asked OSAA to adjust the schedule of that year's tournament to avoid PAA having to play a game on its Sabbath, which is from sunset Friday to sunset Saturday. OSAA agreed to switch PAA's Friday evening game to Friday afternoon but declined to adjust the schedule for Saturday, instead permitting PAA to forfeit a Saturday game if necessary. Ultimately, PAA was not scheduled to play during the day on Saturday, so no conflict or forfeit occurred. However, other schools complained about the agreement to allow PAA to forfeit a game. As a result, in 1997, OSAA informed PAA that, consistently with its current policies, it would no longer authorize PAA to forfeit games; in addition, OSAA stated that it was unwilling to accommodate PAA's concerns by changing from two-game to three-game sessions, by adding another venue, or by eliminating the consolation bracket of the tournament. *Montgomery*, 188 Or App at 65-66.

In 2000, petitioners, who are PAA students, brought a complaint before the OSAA, again asking it to accommodate their religious practices in scheduling that year's tournament. OSAA determined that neither state nor federal law required it to accommodate the students' request and denied it. Petitioners appealed that denial to the board, which denied relief. The first judicial review ensued. *Montgomery*, 188 Or App at 66-67.

B. *The First Review*: Montgomery v. Board of Education

As we have noted, in *Montgomery*, we reversed and remanded for reconsideration. We explained that ORS 659.850, by its terms, prohibits two kinds of discrimination in educational programs: acts that " 'unreasonably differentiate[ ] treatment, intended or unintended,' " that is, disparate treatment discrimination; and acts that are " 'fair in form but discriminatory in operation,' " that is, disparate impact discrimination. *Id.* at 68 (quoting ORS 659.850) (brackets in *Montgomery*). We further explained that both forms of discrimination are prohibited only if the differentiation is "unreasonable." *Id.* at 68-69. We noted that, in enacting ORS 659.850, the 1975 legislature had in mind principles that had developed up until that time—both in federal regulations and in federal decisional law—under Title VII of the Civil

Rights Act of 1964 and amendments thereto. Those princi-
ples included the recognition of disparate impact discrimina-
tion and the obligation of an employer to avoid such discrim-
ination by making a "reasonable accommodation" to an
employee's religious practices, unless the employer demon-
strates that it cannot do so "without undue hardship on the
conduct of the employer's business." *Id.* at 71-77 (quoting 42
USC § 2000e(j)). Finally, we explained that the obligation
under Title VII to *reasonably* accommodate a religious prac-
tice does not constitute an endorsement of religion in viola-
tion of the Establishment Clause of the First Amendment. *Id.*
at 77-78 (citing *Estate of Thornton v. Caldor, Inc.*, 472 US
703, 711-12, 105 S Ct 2914, 86 L Ed 2d 557 (1985) (O'Connor,
J., concurring)).

Having thus construed ORS 659.850, we determined
that, in the order under review, the board had limited its
analysis to disparate treatment discrimination; that it had
found that OSAA did not differentiate on the basis of religion;
and that, although it therefore was unnecessary for the board
to do so, it also had determined that any differentiation was
reasonable. *Id.* at 69. We concluded that, because OSAA's
failure to accommodate the student petitioners' religious
practices would have an impact on their ability to participate
in the basketball tournament, it was necessary for the board
also to consider whether OSAA had fulfilled its obligations in
that regard. *Id.* at 70, 78-79. We instructed the board that, in
doing so, it should be guided by our analysis of the legisla-
ture's intent in enacting ORS 659.850 and by "federal case
law concerning what kinds of accommodations are reason-
able and what kinds of hardships are undue. *See, e.g.*, [*Trans
World Airlines, Inc. v.*] *Hardison*[, 432 US 63, 97 S Ct 2264,
53 L Ed 2d 113 (1977)], *Balint v. Carson City, Nev.*, 180 F3d
1047 (9th Cir 1999); *Heller v. EBB Auto Co.*, 8 F3d 1433 (9th
Cir 1993)." *Montgomery*, 188 Or App at 79. Having deter-
mined that the board erred under the statute, we did not con-
sider petitioners' other constitutional arguments. *Id.* at
79 n 18.

C.  *Reconsideration*

On reconsideration, the board held a hearing in
which petitioners and OSAA presented new evidence, includ-
ing testimony by OSAA executive director Welter and by

PAA athletic director and boys' basketball coach Judd. In its order on reconsideration, the board made supplemental findings of fact pertaining to the structure of the basketball tournament, to petitioners' 10 proposed scheduling "options," and to OSAA's expressed reasons for rejecting them.

The board found that the factors and objectives that OSAA considered in scheduling a tournament included the following: maximizing participation opportunities for students, coaches, parents, friends, family members, and fans; allowing participants to watch all games of a tournament; providing a day of travel for participants to return home before starting the next school week; maximizing revenue; maximizing attendance generally; minimizing expenses to fans and participants; minimizing loss of school time; treating both genders equally; and maximizing attendance at the girls' games. The board found that OSAA's largest source of revenue is gate receipts, that revenue from basketball games subsidizes other OSAA-sponsored activities, and that, in recent years, revenue from basketball has declined "significantly." The board also found that the girls' games generally are not as well attended as the boys' games and that, in order to maximize attendance at the girls' games, OSAA tries to schedule the girls' and the boys' games during the same session, with the girls' games being played first. It also found that OSAA's expenses for tournament games include facility rental, security, ticket sellers, ticket takers, ushers, custodial services, and game officials and that, if there were a reasonable chance of needing to schedule a game at a second venue, OSAA would have to contract for the facility and personnel and would have to pay those costs regardless of whether the second venue were needed.

The board concluded that OSAA had established that each of petitioners' proposed options would create an "undue hardship" because each proposal would impose "more than a *de minimis* burden" on OSAA, on its member schools, on the participants in the tournament, and on fans. The board concluded that, accordingly, in scheduling the tournaments, OSAA did not violate ORS 659.850.

In its discussion, the board explained that this court had referred it to federal cases applying Title VII and that,

consistently with those cases, a hardship is "undue" if it imposes more than a *de minimis* cost on the accommodating entity and that it was OSAA's burden to demonstrate that petitioners' proposed accommodations created an undue hardship under that standard. The board noted that this court has recognized that participation in interscholastic sports is an important part of the educational process.

The board reasoned that specific relevant interests of the OSAA in administering the tournament included the following: maximizing participation and attendance by ensuring that games occur at predictable times and by holding games on days when persons are likely to attend and according to a schedule permitting persons to attend all games; maximizing revenue by increasing attendance and minimizing costs; minimizing "attendance disruptions" by ensuring that the tournament's venue and structure accommodate all persons desiring to attend; maximizing "sportsmanship considerations" such as "tournament records" and the " 'thrill' of progression"; minimizing missed school time; minimizing uncertainty and disruption in the tournament schedule; avoiding a tournament schedule that favors any team over another or favors the boys' games over the girls' games; encouraging attendance at the girls' games; maintaining the "longstanding tradition" of a "double elimination tournament"; and "[n]ot unnecessarily increasing the costs or burdens of interscholastic participation for OSAA, parents of students, fans or the schools."

The board concluded that, by engaging over several years in an "interactive process" of evaluating petitioners' proposals—all of which, the board noted, involved adjusting the Saturday schedule—and by granting petitioners' request to switch the times of Friday games, OSAA had met its obligations under the relevant federal case law. The board determined that, conversely, OSAA was not obligated to consider other, "hypothetical possibilities" that had not been proposed by petitioners.

The board concluded that each of petitioners' 10 proposed accommodations would create an undue hardship, either by permitting or requiring the forfeiture of a game, such as the consolation game ordinarily scheduled for

Saturday afternoon; by altering the basic "double-elimination" format or structure of the tournament; by lengthening the tournament and permitting favored and disfavored scheduling options—for example, some teams having a longer rest period between games; by requiring the scheduling of a triple- or quadruple-header session for the championship games, resulting in attendance disparities and other undesirable effects; or by requiring the scheduling of a final game at a different facility, at a time that would conflict with other final games, resulting in both attendance issues and additional expenses. The board concluded that OSAA therefore did not violate ORS 659.850 by declining to make the requested accommodations.

## II. ANALYSIS

### A. *Preliminary Issue: Motion to Intervene*

■    After oral argument in this matter, petitioners submitted a "motion to intervene or to join new parties as petitioners." The motion seeks to add as petitioners three students at PAA and their parents: Josh Linfoot and his mother, Becky Harvey; Taylor Lewis and his mother, Carlene Lewis; and Andrew Bailey and his mother, Susie Bailey. The motion is supported by an affidavit attesting to the students' status as attendees at PAA and members of the school's basketball team. Neither OSAA nor the board has opposed the motion.

■  .  We have allowed the motion to intervene. In *Barendrecht v. Clark*, 244 Or 524, 419 P2d 603 (1966), the Supreme Court addressed whether appellate courts in this state possess authority to permit interested individuals to intervene on appeal. In that case, the plaintiff brought an action against the Multnomah County Sheriff and one of his deputies, alleging that the deputy had negligently injured him. The county tendered its defense to its insurer, General Insurance Company (General). General refused the tender, and the county took up the defense of the matter. The plaintiff recovered damages, and the county appealed. Apparently, the county later reconsidered and moved to dismiss the appeal. In the meantime, General decided that it wished to pursue the appeal and moved to intervene. The Supreme Court granted the motion, reasoning as follows:

"The question is then, whether under these circumstances this court has the power to permit intervention and, if so, whether General has standing to request it.

"ORS 13.130 [(1965)] provides:

> " 'At any time before trial any person who has an interest in the matter in litigation may, by leave of court, intervene. * * *'

"Read literally, this section permits intervention only before trial. However, in *Duke v. Franklin*, 177 Or 297, 304, 162 P2d 141 (1945), the court explained that ORS 13.130 was intended to make provision for intervention only in those instances in which the court *'must* hear and determine an application in intervention.' (Emphasis ours.) The court held that 'subsequent to the commencement of the trial, leave to intervene may be granted in the exercise of sound discretion, but is not a matter of right.' Adopting this interpretation, we find no obstacle in granting the petition for intervention[.]"

*Barendrecht*, 244 Or at 527-28 (ellipsis in original; footnote, some internal quotation marks omitted). The court also noted the *Duke* court's explanation that courts of equity possess inherent discretionary authority to permit intervention at any time and that there is no evidence that, in enacting the statute pertaining to intervention, the legislature intended to deprive the courts of that authority. *Id.* at 528 n 1.

The current version of ORCP 33 C begins with the identical statement to that contained in ORS 13.130 (1965)—that is, that, "[a]t any time before trial, any person who has an interest in the matter in litigation may, by leave of court, intervene." The current rule then adds a statement that, "[i]n exercising its discretion, the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties."

There being no substantial difference in the phrasing of the current rule and the statute at issue in *Barendrecht*, we can discern no basis for arriving at a different conclusion from the one the court arrived at in that case: We are aware of no indication in the rules of civil procedure or any statute that the legislature intended to deprive courts of equity from their inherent authority to allow a motion to

intervene on appeal. We note that none of the other parties to the appeal has suggested anything to the contrary or even opposed petitioners' motion.

Having determined that we have authority to allow a motion to intervene, we turn to the question whether we should exercise that authority in this case. We conclude that we should do so. In arriving at that conclusion, we have taken into consideration the fact that no other party objects to the motion, that there is no apparent prejudice to any other party that would result from allowing the motion, that the interests of the interveners are identical in all relevant respects to the interests of the petitioners who are already parties, and that their participation might be essential to the resolution of this case, particularly in light of the fact that the case might otherwise become moot.

We proceed to the merits of the appeal.

B. *Analysis of the Merits*

On review, petitioners advance two assignments of error. They first contend that the board erred in various respects in concluding that OSAA did not violate ORS 659.850. They argue that the board also erred in concluding that OSAA's refusal to accommodate their religious beliefs in the scheduling of the state tournament did not violate the religion clauses of the Oregon Constitution. Because we conclude that petitioners' first assignment requires remand, we limit our discussion to that assignment of error.

1. *Petitioners' Contentions*

Petitioners contend in their first assignment that the board erred as a matter of law under ORS 659.850 by determining (1) that petitioners were required to "initiate an accommodation request by making a proposal," (2) by construing the "undue hardship" standard as requiring that OSAA show only that a requested accommodation would impose "more than a *de minimis* cost," and (3) by concluding that every possible accommodation of petitioners' religious beliefs would impose an undue hardship.

First, as to the burden to propose accommodations, petitioners assert that this court's opinion in *Montgomery*

indicates that it was OSAA's burden to identify a reasonable accommodation and that OSAA never suggested any possible accommodation with respect to the Saturday tournament games, instead, in petitioners' view, asking petitioners to make exceptions to their religious beliefs. Petitioners contend that their first proposed option involves accommodating them for just one day out of an entire year—the Saturday of the tournament; that their other options affect only "one event, one week per year"; and that none of those proposals constitutes an undue hardship.

Second, as to the board's use of a "more than a *de minimis* cost" standard, petitioners contend that, because the federal court decision from which that standard derives—*Hardison*—was decided two years after the Oregon legislature enacted ORS 659.850, the legislature could not have intended—indeed, Article I, section 21, of the Oregon Constitution[3] would not permit—that standard to apply. Rather, they argue that, as enacted, ORS 659.850 incorporated only the then-existing standard of "undue hardship" found in 42 USC section 2000e(j), which, in turn, incorporated the "business necessity" standard enunciated in *Griggs v. Duke Power Co.*, 401 US 424, 91 S Ct 849, 28 L Ed 2d 158 (1971).

Third, as to the board's conclusion that OSAA was not required to accommodate petitioners' religious beliefs by any of the suggested methods, petitioners argue that the reasons given by OSAA as to why petitioners' proposals constitute an undue burden—such as inconvenience to spectators—are speculative. They also argue that, where OSAA has changed past tournament schedules for various secular reasons—including conflicts with an SAT test and with the Portand Trailblazers' use of the desired venue, to accommodate television broadcasts, and, in the context of a baseball tournament, because of rain—its refusal to do so to accommodate petitioners' religious practices is unreasonable.

2. *OSAA's Contentions*

OSAA responds, in part, that petitioners failed to preserve and, indeed, invited the board's error, if any, in

---

[3] Article I, section 21, provides, in part, that no law shall be passed, "the taking effect of which shall be made to depend upon any authority[.]"

applying the "more than a *de minimis* cost" standard for undue hardship because, in the proceeding after remand from this court, they themselves relied on cases applying that standard. On the merits, OSAA argues that the board correctly concluded that each of the requested accommodations would impose an undue hardship on OSAA because each accommodation would create more than a *de minimis* burden on third parties. In that regard, OSAA argues that, notwithstanding that the "more than a *de minimis* cost" standard was first articulated after the enactment of ORS 659.850, it properly is applicable because it is logically sound and because it is consistent with the requirements of the Establishment Clause of the First Amendment to the United States Constitution[4]—specifically, that the accommodation of one entity's religious beliefs not have the effect of advancing religion by conferring a religious "benefit" for that entity and imposing a burden on other entities. OSAA also argues that the board correctly determined that it was required to consider only those accommodations proposed by petitioners, not every conceivable accommodation, and argues that the board properly rejected each of petitioners' proposals; in particular, it argues that OSAA's executive director, Welter, never conceded that the proposal involving forfeiture of Saturday games was reasonable. Finally, OSAA argues that petitioners' interpretation of ORS 659.850 would violate Article I, section 20, of the Oregon Constitution[5] by granting petitioners the right to restructure the tournament based on their religious needs while not permitting others the same benefit based on the latter's nonreligious needs.

### 3. *Board of Education's Contentions*

The board relies, in part, on OSAA's response. As does OSAA, it argues that petitioners did not preserve their challenge to its use of the "more than *de minimis*" standard for measuring undue hardship. It also argues that, in any event, that standard properly is applicable under ORS

---

[4] The First Amendment provides, in part, that "Congress shall make no law respecting an establishment of religion[.]"

[5] Article I, section 20, provides that "[n]o law shall be passed granting to any citizen or class of citizens privileges, or immunities, which, upon the same terms, shall not equally belong to all citizens."

659.850 because, as a matter of statutory construction, the legislature would have intended such a standard if it had considered the matter and because the standard avoids constitutional problems. The board argues that, conversely, petitioners' proposed standard, "business necessity," although apposite in the context of employment discrimination, is not useful in the educational context at issue here. Finally, the board argues that its statement that petitioners were required to initiate proposed accommodations was inconsequential because petitioners in fact did so and because the board considered its proposals.

### 4. *Disposition*

■ At the outset, we may quickly dispose of the arguments about the board's conclusion that petitioners were required to make accommodation proposals. We made clear in *Montgomery* that OSAA bears the obligation to attempt to find a reasonable accommodation of petitioners' religious needs. *Montgomery*, 188 Or App at 78-79. Here, however, given our disposition of this appeal, the point is academic and the error of no consequence.

■ Turning to the proper construction of ORS 659.850, we begin by noting that we need not determine the extent to which petitioners preserved their challenge to the use of the "more than a *de minimis* cost" standard for implementing ORS 659.850 because, regardless of the parties' arguments, we are obliged to construe the statute correctly. *See, e.g., Bates v. Gordon*, 201 Or App 619, 622 n 3, 210 P3d 512 (2005) (notwithstanding that parties and trial court assumed throughout proceeding below that statute required application of particular standard, appellate court has independent duty under *Stull v. Hoke*, 326 Or 72, 77, 948 P2d 722 (1997), to correctly construe statute); *State v. Walker*, 192 Or App 535, 542, 86 P3d 690, *rev den*, 337 Or 327 (2004) (where party "plainly put in issue the proper construction of the statute," appellate court has obligation to correctly construe it, regardless of the parties' arguments).

■ We move, then, to the proper construction of ORS 659.850. In interpreting a statute, we determine the intent of

the legislature by examining first the statute's text in context, then its legislative history; if those inquires are insufficient, we apply maxims of statutory construction. *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610-12, 859 P2d 1143 (1993). It is worth emphasizing that the proper focus of Oregon statutory construction is the discernment of "the intent of the legislature that passed [the] statute." *State v. Perry*, 336 Or 49, 52, 77 P3d 313 (2003). In other words, we attempt to determine what the legislature actually intended *at the time of enactment*. As the Supreme Court explained in *Holcomb v. Sunderland*, 321 Or 99, 105, 894 P2d 457 (1995), "[t]he proper inquiry focuses on what the legislature intended at the time of enactment and discounts later events."

With that in mind, we turn to the statute itself. ORS 659.850(2) provides that no person in Oregon may be subjected to "discrimination" in any public education program, service, school, or interschool activity. The statute defines discrimination as "any act that *unreasonably* differentiates treatment, intended or unintended, or any act that is fair in form but discriminatory in operation" based on, among other things, religion. ORS 659.850(1) (emphasis added). As we noted in *Montgomery*, "discrimination" within the meaning of the statute—whether an act that differentiates treatment or an act that is "fair in form but discriminatory in operation"— is an act that "unreasonably" differentiates among members of the protected classes. 188 Or App at 69.

Unfortunately, the legislature did not define what it meant by "unreasonable" differentiation. Nor did we define the term in *Montgomery*. We did note in that case, however, that, when the Oregon legislature enacted the statute in 1975, it did so based "on concepts that had developed under federal employment discrimination law" during the preceding decade. *Id.* at 71. As a result, "the federal application of those concepts is part of the legal context of the statute and assists our evaluation of it." *Id.* at 71-72.

In 1975, when the legislature adopted ORS 659.850, federal law expressly required employers to make reasonable accommodations for their employees' religious obligations. Specifically, Title VII of the Civil Rights Act of 1964 provided

that it is unlawful for an employer to "limit, segregate, or classify [the employer's] employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's * * * religion[.]" 42 USC § 2000e-2(a) (1964). In 1968, the federal Equal Employment Opportunity Commission (EEOC) adopted a guideline interpreting Title VII to require employers to make reasonable accommodations to the religious needs of employees when employers can do so "without undue hardship on the conduct of the employer's business." 29 CFR § 1605.1 (1968). The EEOC guideline did not, however, define what it meant by "undue hardship."

In 1971, the United States Supreme Court interpreted the law to impose a fairly rigorous requirement on employers. In *Griggs*, the Court concluded that Title VII "proscribes not only overt discrimination but also practices that are fair in form, but discriminatory in operation. *The touchstone is business necessity*." 401 US at 431 (emphasis added). According to the Court, if an employment practice that operates to exclude protected persons "cannot be shown to be related to job performance, the practice is prohibited." *Id.*

Meanwhile, in 1972, Congress amended Title VII by adding a provision that defines "religion" to include "all aspects of religious observance and practice" unless an employer demonstrates that it could not "reasonably accommodate an employee's * * * religious observance or practice without undue hardship on the conduct of the employee's business." 42 USC § 2000e(j). As we noted in *Montgomery*, Congress thus adopted the interpretation of Title VII that the EEOC stated in its 1968 guideline.

In short, by 1975, when the Oregon legislature enacted ORS 659.850, the state legislature would have understood the federal law after which it patterned its enactment to prohibit differentiation in treatment unless an employer demonstrates that it cannot reasonably accommodate a religious observance or practice without "undue hardship." To say that the Oregon legislature in 1975 likely intended to incorporate the "undue hardship" standard when it enacted ORS 659.850, however, resolves only part of the

controversy before us. There remains the question as to precisely what the Oregon legislature most likely would have understood the term "undue hardship" to mean in this statutory context and whether, in particular, the legislature likely intended the term to refer, as OSAA and the board suggest, to virtually *any* hardship.

The ordinary meanings of the individual words tell us not very much. *Webster's Third New Int'l Dictionary* 1033 (unabridged ed 2002) defines "hardship" as "something that causes or entails suffering or privation." It also defines "undue," however, both as "unsuited to the time, place, or occasion : improper, inappropriate, inopportune" and as "exceeding or violating propriety or fitness : excessive, immoderate, unwarranted." *Id.* at 2492; *see also Black's Law Dictionary* 1370 (5th ed 1979) (defining "undue" as "[m]ore than necessary; not proper; illegal"). Taken together, however, we think it is fair to say that the ordinary meaning of the term "undue hardship" tells us this: The term is relative in nature and not absolute. Some hardship—that is, some suffering or privation—may be undue—that is, may be excessive, immoderate, or unwarranted under the circumstances. But some also may be due. Said another way, some suffering or privation may be appropriate or warranted under the circumstances. In either case, there is some suffering or privation. It is the degree of that suffering or privation that must be evaluated in light of the circumstances. In that light, OSAA's and the board's conclusion that "undue hardship" refers to anything more than a *de minimis* cost fairly can be viewed as unlikely, for it makes no allowances for hardship that is appropriate or warranted under the circumstances.[6]

---

[6] The common legal meaning of *de minimis* is "trifling," "minimal," or "so insignificant that a court may overlook [them] in deciding an issue or case." *See Black's Law Dictionary* 464 (8th ed 2004) (setting out the quoted definitions of *de minimis*").

We are not the first to make the observation that interpreting "undue hardship" to refer to anything more than *de minimis* hardship is problematic as a matter of ordinary usage. *See, e.g., Trans World Airlines, Inc.,* 432 US at 92 n 6 (Marshall, J., dissenting) ("As a matter of law, I seriously question whether simple English usage permits 'undue hardship' to be interpreted to mean 'more than *de minimis* cost[.]' "); *Anderson v. General Dynamics Convair etc.,* 589 F2d 397, 402 (9th Cir 1978), *cert den,* 442 US 921 (1979) ("Undue hardship means something greater than hardship.").

Oregon statutes in existence by 1975 commonly employ the terms "undue hardship" or "undue burden" in ways that reflect the basic idea that what is "undue" depends on the particular circumstances; in fact, the statutes would not make sense if they were intended to signify no hardship or burden *at all*. *See, e.g.*, ORS 136.625(2) (1973) (judge of another state may order a person in this state to appear to testify in the other state unless it would "cause undue hardship to the witness to be compelled to attend and testify in the prosecution or a grand jury investigation in the other state"); ORS 508.535(1) (1973) (fish canners, fish buyers, fish dealers required to keep records of food fish received and bought to enable Fish and Wildlife Commission to carry out its duties "without imposing undue hardship on the licensees' "); ORS 683.210(2) (1973) (optometrists must attend continuing education courses unless Board of Optometry waives the requirement "in cases of illness, undue hardship, or other similar appropriate reasons").

Similarly, case law in existence by 1975 reflects the common understanding that not just any hardship at all is necessarily "undue." In fact, depending on the circumstances, even a rather substantial hardship may be regarded as something other than "undue hardship." *See, e.g., Coun. Jewish Wom. v. Srs. of Charity*, 266 Or 448, 455-59, 513 P2d 1183 (1973) (significant increases in costs of medical care since time of execution of agreement do not constitute "undue hardship" sufficient to permit discharge of contractual obligations to provide such care).

In that light, we also note that the only Title VII case law of which the Oregon legislature would have been aware in 1975 would have been two cases that imposed not the *de minimis* test that OSAA and the board advance, but instead the more demanding "business necessity" test for which petitioners contend.

The first such case is *Griggs*, in which the United States Supreme Court clearly held that an employer's policy or practice that had a discriminatory effect could be justified only by "business necessity." 401 US at 431.

The second is *Claybaugh v. Pacific Northwest Bell Telephone Co.*, 355 F Supp 1 (D Or 1973), in which the United

States District Court for the District of Oregon examined the question whether the employer violated Title VII in requiring an employee who was a member of the Seventh-Day Adventist Church to work on Saturdays. Relying on the EEOC guidelines that we previously have mentioned, the court held that "[t]his guideline by its very language places an *affirmative duty* upon an employer to attempt an accommodation." *Id.* at 5 (emphasis in original). Then, referring to *Griggs*, the court concluded that, in evaluating the sufficiency of an employer's accommodation efforts, the "business necessity" test applies:

> "The requirement upon an employer to make a reasonable accommodation to the religious needs of an employee is not unbending. However, an employer cannot sustain its burden of showing undue hardship without first showing that it made an accommodation as an attempted remedy. As the degree of business hardship increases, the quantity of conduct which will satisfy the reasonable accommodation decreases. The balancing of reasonableness and hardship is what I believe Chief Justice Burger was referring to [in *Griggs*] as the 'business necessity' which would qualify as a legitimate reason for discharging an employee."

*Claybaugh*, 355 F Supp at 6.

Thus, all relevant indicators suggest that the legislature most likely would have understood that ORS 659.850 prohibited discrimination on the basis of religion unless a school or school district could establish that accommodating a student's religious practices posed an "undue hardship," that is to say, a significant or substantial burden taking into account all relevant circumstances. There is a complete absence of evidence that the legislature would have understood or intended ORS 659.850 to permit discrimination upon a showing that accommodation is not possible without imposing *any* cost that is more than what the law would regard as *de minimis*.

OSAA and the board nevertheless insist that we should read ORS 659.850 to justify discrimination on the basis of religion upon a showing of any hardship more than a *de minimis* cost to the school or district or school program. They contend that we should interpret the state law in that

fashion so as to maximize consistency with *later* federal case law interpreting Title VII and the undue hardship requirement. OSAA and the board place particular emphasis on the fact that, after the Oregon legislature enacted ORS 659.850, the United States Supreme Court in *Trans World Airlines, Inc.*, took a different approach than it did in *Griggs* and held that costs exceeding *de minimis* costs were "undue hardships" as a matter of federal law.

OSAA and the board are correct that, after the Oregon legislature enacted ORS 659.850, *Trans World Airlines, Inc.*, employed—for the first time—a *de minimis* test for determining whether an accommodation to an employee's needs amounts to an "undue burden." In that case, the employee worked in the maintenance and overhaul department of an airline, Trans World Airlines (TWA). The department operated 24 hours a day, seven days a week. An employee who had begun to observe a Saturday sabbath as a requirement of his religion requested that he not be assigned to Saturday work. Under the applicable collective bargaining seniority system in force, however, the union was unwilling to allow the employee to bid for a schedule that did not include Saturdays. In addition, because the employee was the only person available to perform his job on weekends and because leaving the position empty on Saturdays would impair the department's functions, TWA was unwilling to allow the employee to avoid Saturday work by working only four days a week. Finally, TWA declined to fill the employee's Saturday shifts with a supervisor, an employee from another area, or a person who was not regularly assigned to a Saturday shift because to do so would have "undermanned" other operations or required TWA to pay "premium" wages to the employee filling that shift. *Trans World Airlines, Inc.*, 432 US at 66-69.

The Court of Appeals for the Eighth Circuit held that TWA had not made reasonable efforts to accommodate the employee. According to that court, neither the impairment of other departments' functions, nor the necessity of paying premium overtime pay, would have constituted an undue hardship. The Court of Appeals also concluded that allowing the collective bargaining unit to determine whether the seniority

system permitted the requested shift changes did not constitute a reasonable effort to accommodate the employee. *Id.* at 76-77.

The Supreme Court reversed, concluding that TWA made reasonable efforts to accommodate the plaintiff and that each of the relevant accommodations would have constituted an undue hardship on the company. *Id.* at 77. The Court first explained that a bona fide seniority system is a neutral system for allocating work shifts and that abrogating it in order to give effect to employees' religious preferences would deprive other employees of their contractual rights and would amount to "unequal treatment." *Id.* at 79-83. The Court also rejected the Court of Appeals' suggestion that TWA should have permitted the employee to work four days per week. The Court noted that that alternative would have required TWA to replace the employee on Saturdays with supervisory personnel or an employee entitled to "premium" wages, each of which involved "costs to TWA, either in the form of lost efficiency in other jobs or higher wages." According to the Court, "[t]o require TWA to bear *more than a de minimis cost* in order to give [the employee] Saturdays off is an undue hardship." *Id.* at 84 (emphasis added). The Court also held that the suggested alternatives meant that TWA would be allocating the "privilege of having Saturdays off * * * according to religious beliefs." *Id.* at 85.

As we have noted, however, Oregon statutory construction analysis requires us to examine such post-enactment decisions with some caution. *See, e.g., Holcomb*, 321 Or at 105 ("[t]he proper inquiry focuses on what the legislature intended at the time of enactment and discounts later events"). In a few cases, the courts have sought guidance from such post-enactment decisions, but they have justified the practice by the fact that the statutes at issue are intractably ambiguous, and all ordinary aids to construction of those statutes do not reveal which among competing plausible constructions the legislature intended. *See, e.g., Marks v. McKenzie High School Fact-Finding Team*, 319 Or 451, 457-63, 878 P2d 417 (1994). That is not the case here, where all parties agree that there is no evidence that, in 1975, the legislature contemplated the *de minimis* standard that the United States Supreme Court later adopted.

That caution against placing reliance on post-enactment case law developments would seem to us especially appropriate in this case, in light of the fact that, even after *Trans World Airlines, Inc.*, the legislature has continued to employ the term "undue hardship" in a fashion clearly at odds with the *de minimis* standard that *Trans World Airlines, Inc.*, employs.

Of particular significance in that regard is ORS 659A.112, which, along with related statutes, was enacted in 1997. Or Laws 1997, ch 854, §§ 2, 5. The statute prohibits discrimination in hiring and employment of otherwise qualified disabled persons. ORS 659A.112(1). Unlike ORS 659.850, it expressly provides that an employer must make "reasonable accommodations" to the known physical or mental limitations of an otherwise qualified applicant or employee unless the employer can demonstrate that accommodation would impose "undue hardship" on the operation of employer's business. ORS 659A.112(2)(e). Moreover, ORS 659A.121 expressly defines "undue hardship" in that context: It provides that an accommodation imposes an undue hardship on the operation of the business of the employer if the accommodation "requires *significant* difficulty or expense." ORS 659A.121(1) (emphasis added). The statute also provides that, for the purpose of determining whether such difficulty or expense is required, factors to be considered include the "nature and cost" of the accommodation, the "overall financial resources" of the facility and the employer, "impacts on the operation of the facility," and the type of operation, including the "composition" and "functions" of the workforce. ORS 659A.121(2); *see also* Or Laws 2003, ch 603, § 3, *codified as* ORS 659A.192 (providing that, for purpose of statute requiring employer to allow an eligible employee to take leave from employment to attend a criminal proceeding, "undue hardship means a *significant* difficulty and expense to a business" (emphasis added)).

■ OSAA argues that, if for no other reason, we should adopt the *de minimis* standard because any more demanding standard would run afoul of the Establishment Clause of the United States Constitution. According to OSAA, although the United States Supreme Court said nothing about the Establishment Clause as a rationale for its *de minimis* test,

the Court's decision in *Trans World Airlines, Inc.,* properly may be understood to have "implied a concern under the Establishment Clause."

OSAA's argument is but a variation on the one that it advanced without success in *Montgomery,* namely, that "requiring OSAA to accommodate petitioners' religious obligations would constitute religious discrimination against the other participants in the tournament." *Montgomery,* 188 Or App at 77. We noted that, although the United States Supreme Court has not decided the issue, *all* federal circuit courts that have done so have concluded that the religious accommodation requirements of Title VII do not violate the Establishment Clause. *Id.* at 78 n 17. OSAA now argues that, if perhaps requiring *some* accommodation does not violate the Establishment Clause, requiring accommodation that imposes more than a *de minimis* burden certainly does. OSAA, however, does not cite any authority that actually holds that, and we are aware of none.

We conclude that the board erred in applying a *de minimis* test in evaluating whether OSAA could reasonably accommodate PAA in scheduling its tournaments. We recognize that, in *Montgomery,* we advised the board that it might "find assistance" in federal case law concerning what kinds of accommodations are reasonable and "what kinds of hardships are undue." *Id.* at 79. However, we did not directly address the latter issue. Most saliently here, we did not address the question of what *magnitude* of hardships are "undue" for the purpose of ORS 659.850. Having now considered that question, we reach the answer set out above.

Because the board did not apply the standard that we now conclude applies, we reverse and remand for it to do so in the first instance. *See* ORS 183.482(8)(a)(B) (if agency has erroneously interpreted applicable law, this court on review may remand the case to the agency for further action under a correct interpretation of the law).

Reversed and remanded for reconsideration.