Argued and submitted March 5, 2007, decision of Court of Appeals affirmed; order of Oregon State Board of Education reversed, and case remanded to Oregon State Board of Education for further proceedings May 8, 2008

Anthony NAKASHIMA,
Greg Nakashima, Esther Nakashima,
Jonny Long, Lee Long, Sue Long,
Loren Larry, Violet Larry, Josh Linfoot,
Becky Harvey, Taylor Lewis, Carlene Lewis,
Andrew Bailey and Susie Bailey,
*Respondents on Review,*

*and*

Jeremy LONG
and Rodney Larry,
*Intervenors on Review,*

*v.*

OREGON STATE BOARD OF EDUCATION,
*Petitioner on Review,*

*and*

OREGON SCHOOL ACTIVITIES ASSOCIATION,
*Petitioner on Review.*

(Agency No. 581-021-0034-4-00;
CA A123878; SC S053972, S054156)

185 P3d 429

Jonathan M. Radmacher, McEwen Gisvold, LLP, Portland, argued the cause and filed the briefs for petitioner on review Oregon School Activities Association.

Janet A. Metcalf, Assistant Attorney General, Salem, argued the cause for petitioner on review Oregon State Board of Education. With her on the briefs were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Charles F. Hinkle, ACLU Foundation of Oregon, Inc., Portland, argued the cause and filed the brief for respondents on review.

Michael H. Simon, Perkins Coie LLP, Portland, and Marc D. Stern, Counsel of Record, American Jewish Congress, New York, filed a brief on behalf of *amicus curiae* American Jewish Congress.

Before De Muniz, Chief Justice, and Gillette, Durham, Balmer, Walters, and Linder, Justices.**

LINDER, J.

---

** Kistler, J., did not participate in the consideration or decision of this case.

## LINDER, J.

This case requires us to decide the legal standard that applies to determine when a practice or policy is "fair in form but discriminatory in operation" within the meaning of ORS 659.850, which prohibits religious and other forms of discrimination in state-funded school and interschool activities.[1] Petitioners are student athletes at Portland Adventist Academy (PAA) and their parents (collectively, petitioners). In approximately March 2000, petitioners asked the Oregon School Activities Association (OSAA), which is the governing body for interscholastic activities in Oregon, to alter the scheduling of the Class 2A Oregon State High School Boys' Basketball Tournament so that they, as members of PAA's basketball team, would not be required to play tournament games on their Sabbath. OSAA denied the request, and petitioners appealed to the Oregon State Board of Education (board), arguing that OSAA's refusal to alter the scheduling of the tournament was discriminatory under ORS 659.850. The board denied relief.

Petitioners sought judicial review in the Court of Appeals, and that court reversed and remanded for reconsideration by the board. *Montgomery v. Board of Education*, 188 Or App 63, 71 P3d 94 (2003). After the board issued its final order on reconsideration, petitioners again sought judicial

---

[1] ORS 659.850 (1999) provided:

"(1) As used in this section, 'discrimination' means any act that unreasonably differentiates treatment, intended or unintended, or any act that is fair in form but discriminatory in operation, either of which is based on age, disability, national origin, race, marital status, religion or sex.

"(2) No person in Oregon shall be subjected to discrimination in any public elementary, secondary or community college education program or service, school or interschool activity or in any higher education program or service, school or interschool activity where the program, service, school or activity is financed in whole or in part by moneys appropriated by the Legislative Assembly.

"(3) The State Board of Education and the State Board of Higher Education shall establish rules necessary to insure compliance with subsection (2) of this section in the manner required by ORS chapter 183."

When this litigation began, the statute was codified as ORS 659.150. It was renumbered in 2001, and for convenience, we cite to the statute using its current designation. The legislature amended the statute in 2007. *See* Or Laws 2007, ch 100, § 29. Those amendments do not affect our analysis.

review, and the Court of Appeals again reversed and remanded for reconsideration. *Nakashima v. Board of Education*, 204 Or App 535, 131 P3d 749, *adh'd to on recons*, 206 Or App 568, 138 P3d 854 (2006). We allowed petitions for review filed by the board and by OSAA. As we will explain, we agree with the Court of Appeals that the board did not review OSAA's actions under the correct legal standard, but our analysis differs, in part, from the analysis that the Court of Appeals followed.

## I. FACTS AND PROCEDURAL HISTORY

The basic facts are not in dispute and are largely drawn from the Court of Appeals decisions and the board's order. OSAA is a voluntary organization of public and private schools in Oregon that the board has approved to administer interscholastic activities. PAA is a private Seventh-day Adventist Church school and a member of OSAA. Petitioners are Seventh-day Adventists. One of the tenets of the Seventh-day Adventist religion is observance of a Sabbath that begins at sundown on Fridays and continues through sundown on Saturdays. Consistently with their religious beliefs, neither PAA nor the student petitioners participate in competitive sports during their Sabbath.

The Class 2A basketball tournament is held in Pendleton and, as of 2004, includes eight boys' teams and eight girls' teams.[2] All games are played at the Pendleton Convention Center. The girls' first-round (quarterfinal) games are held on Wednesday in two sessions, each of which is a block of two games played sequentially, or "back to back." The sessions are held at 1:30 p.m. and 6:30 p.m. The boys' first-round games are held on Thursday, likewise in two sessions, with the same starting times as the Wednesday games. On Thursday, there is also a third session, one that consists of two girls' "consolation" games, with that session commencing at 9:00 a.m.

---

[2] As we later explain, in 2005, OSAA moved PAA to the 3A classification, which holds its annual tournament in Salem. We describe the schedule for the Pendleton tournament to provide context for the dispute between the parties, which is not mooted by the way in which games are scheduled for the 3A tournament in Salem. *See* 344 Or at 516-17.

On Friday, there is a morning session of two boys' "consolation" games; in the afternoon, there is a session consisting of a boys' semifinal game and a girls' semifinal game. On Friday evening, there is another session, again consisting of a boys' semifinal game and a girls' semifinal game. The consolation finals—the games involving the two remaining girls' teams and the two remaining boys' teams that lost their initial tournament games—are played in a Saturday morning session. Each winner receives a fourth place trophy. The boys' and girls' third place games—the games between the two girls' teams and the two boys' teams that won their initial tournament games, but then lost their semifinal contests—are played in a Saturday afternoon session. The championship games are played in a Saturday evening session with the girls' game played first at 7:00 p.m.

Thus, under the schedule, PAA potentially may be required to play on its Sabbath (that is, after sundown on Friday or before sundown on Saturday), depending on how it proceeds through the tournament brackets. The same is not true, however, for participants who observe a Sunday Sabbath. As a matter of long-standing practice, OSAA never schedules athletic events, including games that are part of the annual tournaments, on Sundays; OSAA has done so in the past only if necessary due to such unforeseen circumstances as inclement weather.

In 1996, PAA asked OSAA to adjust the schedule of games for the Class 2A boys' basketball tournament to avoid requiring PAA's team to play any game scheduled on its Sabbath. OSAA agreed to switch the schedule of the Friday games to avoid such a conflict, because those games are relatively interchangeable.[3] OSAA was not willing, however, to adjust the Saturday games, which follow a set order. OSAA indicated that if PAA refused to play a Saturday game for which it qualified, PAA would have to forfeit the game. Because PAA in 1996 qualified for the championship game, which began after sundown on Saturday, no actual conflict occurred and PAA did not forfeit a game.

---

[3] The board found that OSAA continues to be willing to make that change to the Friday schedule of games. Therefore, the issue in this case involves only OSAA's schedule of games during the day on Saturday.

OSAA's agreement to allow PAA to forfeit a game led to numerous complaints from school officials. The complaints were principally concerned with the potential for a game in the consolation brackets to end in a forfeiture, which would deprive any team scheduled to play against PAA of a round of play in the tournament. As a result of the negative reaction to the forfeiture possibility, OSAA in 1997 decided not to permit PAA to forfeit any game that would require the PAA team to play on its Sabbath. OSAA so advised PAA.

The issue did not surface again until 2000. In advance of the tournament that year, petitioners[4] again asked OSAA to adjust the scheduling of that year's tournament so that PAA team members would not have to play on their Sabbath. OSAA's Executive Board issued an order concluding that OSAA had no obligation under state law to alter the schedule for PAA and that, in all events, to do so would violate the Establishment Clause of the First Amendment to the United States Constitution. Petitioners appealed OSAA's order to the board pursuant to OAR 581-021-0049.[5] The board dismissed the complaint in 2002, after concluding that OSAA did not violate any laws or rules in scheduling the

---

[4] At different times throughout the course of this proceeding, the board has allowed additional student athletes and their parents to join the case as parties. Similarly, the Court of Appeals, while review was pending before it, permitted additional student athletes and their parents to intervene in this case. *Nakashima*, 204 Or App at 543-45. Most recently, on January 17, 2008, this court granted two student athletes, Jeremy Long and Rodney Larry, permission to intervene in this case. At the same time, as student athletes graduated from PAA, this case became moot as to those students and their parents (if a sibling was not also named as a party), and the Court of Appeals dismissed review as to those students. *Montgomery*, 188 Or App at 65, 65 n 3. Similarly, while the case has been under advisement by this court, additional students have graduated from PAA. Accordingly, we dismiss review as to Anthony Nakashima and his parents Greg and Esther Nakashima, as to Jonny Long (but not as to his parents Lee and Sue Long, who also are the parents of Jeremy Long), and as to Loren Larry (but not as to his mother Violet Larry, who also is the mother of Rodney Larry).

[5] OAR 581-021-0049 provides generally for the board's review (through the Superintendent of Public Instruction) of the resolution of complaints of discrimination against "districts," which petitioners apparently understood at the time to apply to OSAA as an entity that is composed of schools and that administers interscholastic activities. In January 2006, the board adopted a new rule, OAR 581-021-0042, which specifically applies to appeals from decisions concerning interscholastic activities by voluntary organizations authorized to administer such activities. That rule, although more detailed, provides for an administrative review procedure that, in all material respects, is substantially similar to OAR 581-021-0049. In all events, ORS 339.430(3) authorized such an appeal to the board.

tournament.[6] In its order, the board found that OSAA's policies for its tournament games were religion-neutral. In particular, the board found that, "[r]egardless of any historical reasons for not scheduling tournament games on Sundays," OSAA currently enforces that policy for valid secular reasons, rather than to accommodate the religious beliefs of persons who observe a Sunday Sabbath. The board also found that, with regard to the tournament more generally, "OSAA does not differentiate between secular and sectarian circumstances when making its tournament decisions. Any tournament rescheduling by OSAA is based on nonpreferential adjustments that serve to maintain competitive balance and other neutral OSAA policies."

Petitioners sought judicial review of the board's order in the Court of Appeals.[7] In *Montgomery*, the Court of Appeals held that ORS 659.850 prohibits facially neutral practices that have a discriminatory effect on protected groups, as well as intentionally discriminatory treatment. 188 Or App at 68. In its order, however, the board had considered only whether OSAA engaged in intentional discrimination. *Id.* at 69-70. The Court of Appeals concluded that the legislature enacted ORS 659.850 based on concepts that had developed under federal employment discrimination law. *Id.* at 71-72. Drawing from those federal law concepts, the court held that the statute requires OSAA to attempt to reasonably accommodate petitioners' religious beliefs. *Id.* at 77-79. The Court of Appeals therefore determined that ORS 659.850 required OSAA to attempt to make a reasonable accommodation of the petitioners' religious needs and that, by failing to consider whether OSAA had fulfilled that obligation, the board erred. *Id.* at 77, 79. In remanding the case to the board to consider that issue, the Court of Appeals noted that the board might "find assistance" in the extensive body of existing federal case law on the issue of reasonable

---

[6] The Deputy Superintendent of Public Instruction issued the order on the board's behalf. *See* OAR 581-021-0044 (authorizing board to delegate authority to hear and enter final orders on discrimination complaints).

[7] *See* ORS 339.430(3) (2001) (providing that board decisions concerning interscholastic activities may be judicially reviewed under ORS 183.482). In 2003, the legislature renumbered subsection (3) as subsection (6), and amended the statute in minor ways that are not relevant to the matter before us.

accommodation of religion in the employment context, and specifically drew the board's attention to *Trans World Airlines, Inc. v. Hardison*, 432 US 63, 97 S Ct 2264, 53 L Ed 2d 113 (1977), *Balint v. Carson City, Nev.*, 180 F3d 1047 (9th Cir 1999), and *Heller v. EBB Auto Co.*, 8 F3d 1433 (9th Cir 1993). *Id.*

On remand, the board reopened the record for additional evidence. In its order on reconsideration, the board adopted its original factual findings and made extensive supplemental ones. The board reviewed the federal cases cited by the Court of Appeals to determine the legal standard that it should apply. Based on that review, the board concluded that "[a]n obligation to accommodate a religious need ends when the proposed accommodation imposes an undue hardship on the employer. A hardship is 'undue' if it imposes more than a *de minim[i]s* burden."

The board then applied that standard to the controversy before it. The board began by identifying the various factors that OSAA strives to serve in scheduling the tournament. The board summarized those factors as "[to] maximize revenue, maximize attendance in general, minimize expenses to fans and participants, minimize loss of school time, treat both genders equally, and maximize attendance at girls' games."[8]

Next, the board examined each of 10 scheduling alternatives that petitioners had proposed and that OSAA had rejected. One alternative was to permit what OSAA had agreed to permit in 1996—*i.e.*, the forfeiture of any game that

---

[8] The board also made detailed findings describing OSAA's relevant goals. Those findings included that OSAA, in administering the tournament seeks to (1) maximize participation and attendance by ensuring that games occur at predictable times and by holding games on days when persons are likely to attend and according to a schedule permitting persons to attend all games; (2) maximize revenue by increasing attendance and minimizing costs; (3) minimize "attendance disruptions" by ensuring that the tournament's venue and structure accommodate all persons desiring to attend; (4) maximize "sportsmanship considerations" such as "tournament records" and the " 'thrill' of progression"; (5) minimize missed school time; (6) minimize uncertainty and disruption in the tournament schedule; (7) avoid a tournament schedule that favors any team over another or favors the boys' games over the girls' games; (8) encourage attendance at the girls' games; (9) maintain the "longstanding tradition" of a "double elimination tournament"; and (10) "[n]ot unnecessarily increas[e] the costs or burdens of interscholastic participation for OSAA, parents of students, fans or the schools."

PAA might be scheduled to play during the day on Saturday. Several other alternatives involved moving any game scheduled for play during the day on Saturday to a time after sundown. Two of the proposals involved playing the rescheduled game at a second venue, either in the evening at the same time as the girls' championship game or before the girls' championship game (which would require scheduling the girls' game to begin later). Other proposals involved rescheduling any game that PAA might otherwise be scheduled to play during the day on Saturday to the evening on Saturday at the same venue as games scheduled for Saturday evening. Under those proposals, instead of a two-game session on Saturday evening, the schedule would call for three- or four-game sessions. Finally, several proposals involved playing all the first-round games on Wednesday, which would require fewer games to be scheduled on Friday and Saturday. Each of those proposals included schedules for Friday and Saturday games that would either minimize or eliminate the potential for the schedule to require PAA to play at a time that conflicted with the observance of petitioners' Sabbath.

After reviewing petitioners' proposed rescheduling options and OSAA's reasons for rejecting them, the board concluded that each proposal would impose more than a *de minimis* burden on "OSAA as an organization, on the fans, on the participants and/or on the member schools." The burdens that the board identified included an opposing team's lost opportunity to participate in a round of play if PAA were permitted to forfeit any game that it is scheduled to play during the day on Saturday; added cost and work for OSAA in holding a Saturday evening game at a second venue; possible increased ticket prices for three- and four-game sessions; greater inconvenience to fans in securing good seats at three- and four-game sessions; possible reduced attendance at the girls' games; and a loss of additional school time for some of the students if all first-round games of the tournament were played on Wednesday. Based on those findings, the board concluded that OSAA's policies for scheduling the Class 2A boys' tournament did not violate ORS 659.850.

Petitioners again sought judicial review of the board's order. The principal dispute on review was the

correctness of the legal standard that the board applied—
*viz.*, that OSAA had no obligation to accommodate petition-
ers' religious beliefs if doing so would impose an "undue hard-
ship" in the form of a more than a *de minimis* burden on
OSAA's interests.[9] The Court of Appeals concluded that the
federal cases on which the board relied (and that the Court of
Appeals in *Montgomery* had cited for "assistance" on remand)
did not reflect the prevailing federal law when ORS 659.850
was enacted. *Nakashima*, 204 Or at 553-55, 557. Rather,
after examining "all relevant indicators" of the legislature's
intent, the Court of Appeals determined that, although the
correct test for whether a reasonable accommodation must be
made is "undue hardship," the legislature most likely under-
stood that test to require "a significant or substantial burden
taking into account all relevant circumstances." *Id.* at 553.
The Court of Appeals also rejected OSAA's further contention
that a *de minimis* burden test should be adopted to avoid con-
flict with state and the federal constitutional principles. *Id.*
at 557. Because it concluded that the board had applied the
wrong legal standard in evaluating whether OSAA reason-
ably could accommodate petitioners in scheduling its tour-
naments, the Court of Appeals reversed and remanded a sec-
ond time to allow the board to apply the correct standard. *Id.*
OSAA sought reconsideration of the Court of Appeals deci-
sion; the Court of Appeals allowed reconsideration and
adhered to its opinion. *Nakashima v. Board of Education*,
206 Or App 568, 138 P3d 854 (2006).[10] As noted, both the
board and OSAA then petitioned for review, and this court
granted both petitions.

---

[9] Petitioners also challenged the board's conclusion that it was petitioners'
obligation, rather than OSAA's, to propose a reasonable accommodation. The Court
of Appeals initially concluded in *Montgomery* that OSAA bears that burden. 199 Or
App at 78-79. It reaffirmed that conclusion in its second decision in *Nakashima*.
204 Or App at 548. The court further concluded, given the record and the proce-
dural posture of the case, that the point was "academic and the error of no conse-
quence." *Id.* No party raises an issue in this court with regard to the Court of
Appeals' resolution of that question.

[10] On reconsideration, the Court of Appeals primarily clarified some aspects
of its original decision in *Nakashima* and reaffirmed some of its conclusions in
*Montgomery*. The decision on reconsideration does not significantly affect the
issues before us on review.

## II. DISCUSSION

A. *ORS 659.850: the meaning of "fair in form but discrimi-*
   *natory in operation"*

The statute that we must interpret in this case, ORS 659.850, was enacted in 1975 to address discrimination in the area of publicly funded educational activities and programs. The operative prohibition declares that "[n]o person" in Oregon shall be subjected to "discrimination"

> "in any public elementary, secondary or community college education program or service, school or interschool activity or in any higher education program or service, school or interschool activity where the program, service, school or activity is financed in whole or in part by moneys appropriated by the Legislative Assembly."

ORS 659.850(2). "Discrimination," for purposes of that prohibition, is defined to mean

> "any act that unreasonably differentiates treatment, intended or unintended, or any act that is fair in form but discriminatory in operation, either of which is based on age, disability, national origin, race, marital status, religion or sex."

ORS 659.850(1).

In this case, petitioners do not claim that OSAA has any policy or practice in place that affirmatively treats them differently based on their religion.[11] Their claim, instead, is that OSAA's policies, although "fair in form," discriminate against them "in operation" based on their religion. The precise question that we must decide in this case, therefore, is what legal standard applies to determine whether a policy or practice that is facially nondiscriminatory nevertheless has a prohibited discriminatory effect.

In interpreting ORS 659.850, our goal is to determine the intent of the legislature that enacted it in 1975. *State v. Perry*, 336 Or 49, 52, 77 P3d 313 (2003). To accomplish that, we look first to the text of the statute itself. *See PGE v. Bureau of Labor and Industries*, 317 Or 606, 610-12, 859 P2d

---

[11] Petitioners initially advanced an intentional differential treatment claim. They did not prevail on it before the board, however, and they no longer assert it.

1143 (1993) (outlining methodology). As the Court of Appeals correctly observed, the statute textually embraces two forms of discrimination that are familiar concepts in state and federal discrimination law. *Montgomery*, 188 Or App at 68. The prohibition of an act that "unreasonably differentiates treatment" describes disparate treatment discrimination—*i.e.*, a policy or practice that affirmatively treats some persons less favorably than others based on certain protected criteria, such as race, sex, or religion.[12] The prohibition of an act that is "fair in form but discriminatory in operation" describes disparate impact discrimination—*i.e.*, a facially neutral policy that adversely effects a group that shares certain protected characteristics, such as race, sex, or religion.[13] The distinctive "fair in form but discriminatory in operation" terminology that the legislature used is, word-for-word, the phrase coined by the United States Supreme Court in *Griggs v. Duke Power Co.*, 401 US 424, 431, 91 S Ct 849, 28 L Ed 2d 158 (1971) (holding that Title VII of the Civil Rights Act of 1964 reaches not only overt discrimination but also practices that are "fair in form, but discriminatory in operation"). With that phrase, the Supreme Court judicially embraced, for the first time, the theory of discrimination that has since come to be known by

---

[12] In *City of Portland v. Bureau of Labor and Ind.*, 298 Or 104, 123 n 1, 690 P2d 475 (1984), we quoted from a respected treatise to describe the "usual" disparate treatment case as

" 'an individual case [in which] the focus of the contest is on the employer's motivation for the different action taken, with the plaintiff attempting to prove intentional bias and the employer contending that its actions were based on a legitimate, nondiscriminatory reason.' "

(Quoting B. Schlei and P. Grossman, *Employment Discrimination Law* 1286 (2d ed 1983).) In ORS 659.850, the legislature made the concept more expansive by reaching disparate treatment discrimination "whether intended or unintended." At the same time, the legislature expressly tempered the statute's reach by prohibiting only those acts that "unreasonably" differentiate treatment on a prohibited basis.

[13] In *City of Portland*, this court endorsed the following description of the disparate impact theory of discrimination:

" 'In contrast to the disparate treatment theory, proof of discrimination under the adverse impact theory focuses upon the effects of the alleged discriminatory practice. The consequences of employment policies rather than the employer's motivation or intent is of paramount concern. The essence of the adverse impact theory is a showing that a policy or practice has a substantial adverse impact on a protected group, notwithstanding its equal application to all individuals. * * *' "

298 Or at 123 n 1 (quoting B. Schlei and P. Grossman, *Employment Discrimination Law* 1286 (2d ed 1983)).

the short-hand descriptions of "disparate impact" and "adverse impact" discrimination.[14] That landmark holding issued in 1971, just four years before ORS 659.850 was enacted. We therefore agree with the Court of Appeals that, by using that legal term-of-art phrasing, the legislature adopted the disparate impact theory of discrimination directly from *Griggs*.

The question remains, however: What legal standard did the legislature intend to determine whether a neutral policy or practice is "discriminatory" in operation? Because the legislature drew from *Griggs*, the Court of Appeals concluded the statute was "patterned on" Title VII of the Civil Rights Act of 1964 and was based on concepts that had developed under federal employment discrimination law. *Nakashima*, 204 Or App at 550; *Montgomery*, 188 Or App at 68, 71-72. By 1975, those federal concepts included an employer's obligation to "reasonably accommodate" the religious beliefs of its employees. *Nakashima*, 204 Or App at 549-53 (discussing federal precedents); *Montgomery*, 188 Or App at 71-78 (same). The Court of Appeals therefore canvassed Title VII cases that predated ORS 659.850, and concluded that the legislature most likely intended the reasonable accommodation test articulated in those cases, which required undue hardship in the form of a "significant or substantial burden" taking into account "all relevant circumstances." *Nakashima*, 204 Or App at 552-53. The Court of Appeals rejected the *de minimis* cost or burden test articulated in some post-1975 federal cases. *Id.* at 553-57.

Our disagreement with the Court of Appeals' analysis concerns its resort to Title VII case law.[15] That step in the

---

[14] Disparate impact as a theory of discrimination "was born full-grown" as a result of the Supreme Court's articulation of the theory in *Griggs*. Lindemann & Grossman, I *Employment Discrimination Law*, ch 3.I at 113 (4th ed 2007). Until *Griggs* was decided, a few lower courts at most had suggested the concept; none had formally recognized it as a distinct legally cognizable theory and none had used the terminology that courts have since settled on. *Id.* at 113, 113 n 5; *see generally id.* at 114 (describing *Griggs* as the seminal case in the area).

[15] As an intermediate step in its analysis, the Court of Appeals first concluded, based on the wording of ORS 659.850(1) as a whole, that an act that disparately impacts a protected group is prohibited only if it does so "unreasonably." *Montgomery*, 188 Or App at 68-69. We need not decide if that particular aspect of the Court of

court's analysis is at first blush understandable, because *Griggs* involved a claim brought under Title VII, which addresses discrimination in employment. And *Griggs*, as we have concluded, was the source of the distinctive phrasing that the legislature used in ORS 659.850 to include disparate impact discrimination within the statute's sweep.

But contrary to the Court of Appeals' conclusion and the assumptions of the parties, ORS 659.850 was not patterned on Title VII or on its provisions requiring reasonable accommodation of religion. The two statutory schemes are aimed at different concerns (employment discrimination in the private and public sectors, as opposed to discrimination in publicly funded educational activities at elementary through university levels). They share no significant textual parallels. ORS 659.850 and Title VII simply are not statutory analogues.[16] *Griggs*, moreover, involved a claim of racial, not religious, discrimination. *Griggs* therefore did not discuss or have reason to consider an employer's duty of reasonable accommodation under Title VII, or the "undue hardship" standard that applies to it, which arises only in connection with religious discrimination.[17] Consequently, the legislature's reliance on *Griggs* for phrasing to describe disparate

---

Appeals' analysis was correct. As we will explain, the disparate impact test derived from *Griggs* itself encompasses a reasonableness component as an aspect of when a neutral policy or practice is or is not "discriminatory in operation." The intermediate analytical step that the Court of Appeals took was therefore unnecessary.

[16] Oregon had a statutory analogue to Title VII in place when ORS 659.850 was adopted, one that preexisted Title VII by more than a decade. *See* Or Laws 1949, ch 221 (providing, in part, that the "opportunity to obtain employment without discrimination because of race, religion, color or national origin" is a "civil right"). In 1953, the Revisor of Statutes codified the statutes at ORS 659.010 to 659.140.

[17] When *Griggs* was decided, neither a duty of "reasonable accommodation" for an employee's religious beliefs, nor the "undue hardship" standard that applies to that duty, was expressed in the text of Title VII. Rather, at that time, both were part of federal employment discrimination law only as a result of a 1968 guideline promulgated by the Equal Employment Opportunity Commission (EEOC). In that guideline, the EEOC interpreted Title VII to require employers to make reasonable accommodations to the *religious* needs of employees when the employers could do so "without undue hardship on the conduct of the employer's business." 29 CFR § 1605.1 (1968). The "undue hardship" standard thus was limited to accommodation of religion. In 1972, one year after *Griggs* was decided, Congress amended the definition of "religion" in Title VII in a way that essentially incorporated the duty of religious accommodation and the "undue hardship" test from the 1968 EEOC guideline, thus making those concepts a part of the express text of Title VII for the first time. 42 USC § 2000e(j).

impact discrimination provides no basis to conclude that the legislature had concepts of reasonable accommodation of religion in mind in enacting ORS 659.850.[18]

That does not mean, however, that federal law cannot aid us. It may. But the federal law to which we should look is *Griggs* itself. In borrowing from *Griggs* its judicially crafted legal phrasing to describe what was, at the time, a novel and developing theory of discrimination, the legislature embraced disparate impact as a cognizable theory of discrimination for purposes of ORS 659.850. *Griggs* is thus context for determining what the legislature understood disparate impact, as a theory of discrimination, to entail. *See Central Catholic Ed. Assn. v. Archdiocese of Portland*, 323 Or 238, 251, 916 P2d 303 (1996) (context for interpreting statutory terms includes the established meaning of legal terms of art). We therefore turn to a detailed examination of *Griggs* and its holding.

*Griggs* involved a class action discrimination claim brought against a private employer with a history of intentionally discriminating against African-Americans, and in favor of whites, in hiring, placement, and advancement decisions. The employer abandoned its overtly discriminatory policies in the mid-1960s, when the Civil Rights Act of 1964 was passed. Simultaneously, however, the employer adopted hiring criteria for the positions traditionally held only by white employees. The criteria—a high school education and successful completion of two tests that purported to measure general intelligence—were intended to ensure that applicants had the ability to perform the job. *Griggs*, 401 US at 426-28. As a result of using those hiring criteria, "a markedly disproportionate number" of African-Americans were ineligible for many jobs and for most advancement opportunities

---

[18] To verify that observation, we have examined the legislative history. It confirms that the Supreme Court's decision in *Griggs* was the source of the distinctive "fair in form" terminology that became part of the definitional subsection (legislators at some points referred to it as the "Powers" case, an apparent reference to the defendant Duke Power Company; other references included both "Powers" and "Griggs" in the case title). Tape Recording, Senate Floor Debates on HB 2131, May 7, 1975, Tape 16B, Side 2, at 592 *et seq.* (comments of Senator Edward Fadeley); Tape Recording, House Floor Debates on HB 2131, May 8, 1975, Tape 20, Side 1, at 753 *et seq.* (comments of Representative Mary Rieke). Neither the definitional subsection, nor ORS 659.850 more generally, was patterned on Title VII.

in the employer's business. *Id.* at 429. By the time the case reached the Supreme Court, the dispute was not whether those job requirements were a pretext for intentional discrimination; the Court accepted the district court's factual determination that the employer lacked a subjective racial or discriminatory purpose in adopting them. *Id.* at 428-29. Instead, the issue was whether "a subjective test of the employer's intent should govern," which was, as the Court described it, an issue of "first impression." *Id.* at 428.

The Court concluded that discriminatory intent was not necessary. The Court did not base that conclusion on the explicit text or wording of Title VII itself, but instead based it on Congress's objective "to achieve equality of employment opportunities and remove barriers that have operated in the past to favor an identifiable group of white employees over other employees." *Id.* at 429-30. The Court expressly rejected the proposition that, to achieve that objective, "[d]iscriminatory preference for any group, minority or majority" was required or even permissible. *Id.* at 431. Title VII was not, in the Court's view, intended "to guarantee a job to every person regardless of qualifications." *Id.* at 430. The Court held, however, that, when "practices, procedures, or tests neutral on their face, and even neutral in terms of intent" have the same effect as overtly discriminatory practices, they too are prohibited. *Id.*

Significantly, the Court did not hold that any differential effect on a protected group is discriminatory, and therefore prohibited. Rather, the "discriminatory" quality of a practice depends on whether it creates "artificial, arbitrary, and unnecessary barriers" for a protected group. *Id.* at 431. In the key passage from which our legislature drew the "fair in form" wording, the Court explained what an employer must show to defend a policy or practice that "operates to exclude" a protected group from a job or job advancement:

> "[Title VII] proscribes not only overt discrimination but also practices that are fair in form, but discriminatory in operation. The touchstone is business necessity. If an employment practice which operates to exclude [a protected group]

cannot be shown to be related to job performance, the practice is prohibited."

*Id.* at 431.

The employer in *Griggs* presented no evidence of "business necessity" or "job-relatedness." *Id.* at 432. The Court's discussion of why the record was deficient in that regard repeatedly emphasized what an employer must do to show that the differential impact on a protected group is not discriminatory. The Court described the employer's evidence in *Griggs* as insufficient because the employer had not established that its criteria for hiring and advancement "fulfill[ed] a genuine business need" (*id.* at 432); had "a manifest relationship to the employment in question" (*id.*); bore a "demonstrable relationship to successful performance" for the jobs for which they were used (*id.* at 431); were based on any "meaningful study" demonstrating that they measured actual job ability (*id.*); or were "significantly correlated with important elements" of the jobs for which they were required (*id.* at 433, 433 n 9, quoting with approval implementing administrative guidelines pertaining to employer job testing). In the closing lines of its opinion, the Court reiterated its point: "What Congress has forbidden is giving these devices and mechanisms controlling force unless they are *demonstrably a reasonable measure* of job performance." *Id.* at 436 (emphasis added).

■ We presume that our legislature, in adopting disparate impact as a theory of discrimination from *Griggs*, understood that theory as *Griggs* explained it. We also presume that the legislature was aware of any existing decisions of this court that considered or interpreted the disparate impact theory of discrimination as announced in *Griggs. See Joshi v. Providence Health System*, 342 Or 152, 158, 149 P3d 1164 (2006) (this court will presume that the legislature is aware of existing decisions of this court interpreting the legal meaning of terms that the legislature uses in an enactment). When the legislature enacted ORS 659.850, one such decision existed: *School District No. 1 v. Nilsen*, 271 Or 461, 481-83, 534 P2d 1135 (1975).[19] *Nilsen*, after quoting the same key

---

[19] Nilsen was decided on April 1, 1975, just a few weeks before the legislature incorporated the wording from *Griggs* as part of the statutory definition of

"fair in form but discriminatory in operation" passage from *Griggs* that we have quoted above, observed that the disparate impact test from *Griggs* is not an absolute one that prohibits any adverse effect on a protected class. *Nilsen*, 271 Or at 481-82. Rather, *Nilsen* described *Griggs*'s disparate impact test as permitting neutral policies and practices that adversely affect a protected group if the policies or practices are "reasonably necessary" to job requirements. *Nilsen*, 271 Or at 483.

Griggs and *Nilsen* together provide guidance as to what our legislature intended in 1975 when it drafted ORS 659.850 to prohibit policies and practices that are "fair in form but discriminatory in operation." Under *Griggs*, if a neutral policy or practice disparately affects a protected group by excluding members of the group from equal access to jobs or advancement, that effect is discriminatory in operation unless the policy is "reasonably necessary" to the employer's business. *Nilsen*, 271 Or at 483. To satisfy that test, a policy must have a "demonstrable relationship" to successful performance of the employer's work; must be "significantly correlated" to "important elements" of the work; or must fulfill a "genuine business need." *Griggs*, 401 US at 432-33.

To be sure, *Griggs* was decided in an employment context and therefore was written in terms of business needs and justifications. Those concepts translate meaningfully to education-related programs and activities, however. By embracing *Griggs*'s theory of disparate impact discrimination in ORS 659.850, the legislature intended to give similar protection to participation in public education-related activities and programs. We do not understand the notion of need or necessity, as described in *Griggs*, to pose an impossible burden on an entity defending a neutral policy that adversely affects a protected group. But the terms do convey that the policies must be demonstrably related or correlated to important elements of a program or activity, given what the program or activity exists to accomplish. Applied to this context, *Griggs*'s test of what is "discriminatory in operation" depends

discrimination in subsection (1) of the statute. *See* 344 Or at 512 n 18 (discussing legislative history).

on whether a practice or policy that disparately impacts a protected group is reasonably necessary to a program's or activity's successful operation or the achievement of its essential objectives.[20]

B. *The board's order on reconsideration*

■ With that understanding, we turn to the board's order in this case—both to the legal test that it applied and to the conclusions that the board reached in its analysis of OSAA's scheduling policies. As we earlier described, to determine whether OSAA's policies violate ORS 659.850, the board analyzed whether a change to those policies would impose more than a *de minimis* burden on OSAA's interests in administering the tournament. The *de minimis* burden test that the board applied is a lower standard than ORS 659.850 requires, as we elaborate below. This case therefore must be remanded to the board for reconsideration, as the Court of Appeals concluded. *See* ORS 183.482(8)(a)(B) (authorizing remand on judicial review for reconsideration under a correct interpretation of a provision of law).

On remand, the facts and circumstances that the board must consider likely will differ, at least in some regards, from those before the board at the last evidentiary hearing. In their briefs on review, petitioners have advised us that, in 2005, OSAA announced a new classification system that took effect in the 2006-07 school year. Under that system, PAA has a "3A" classification. The basketball tournament in which petitioners will play, if they qualify, will be in Salem, not Pendleton. The change in venue for the tournament in which PAA plays may alter at least some of the considerations that PAA takes into account in the scheduling of the tournament.[21] Nevertheless, we discuss two aspects of

---

[20] Petitioners posit that *Griggs*'s "business necessity" test and the "reasonable accommodation" test that prevailed as of 1975 are "different ways of making the same point." Perhaps, at least for some purposes and in some contexts. Even if the two inquiries sometimes yield the same answers, we frame the issue as it is framed by the statute, not as it would be framed by Title VII concepts that were not the source of ORS 659.850.

[21] The essential controversy before us remains a live one, however. For religious reasons, petitioners continue to be unable to play in games scheduled between sundown on Friday and sundown on Saturday; petitioners continue to assert that OSAA's scheduling policies discriminates against them in violation of ORS 659.850; OSAA continues to maintain that scheduling the tournament in such a way that PAA may be required to play on its Sabbath does not violate ORS 659.850.

the board's order and analysis that merit the board's attention on remand. We do so in an effort to give the board as much guidance as possible on the record before us, with appreciation for the desire that the parties and the board undoubtedly have to achieve a resolution of this case.

First, as a threshold matter, the board assumed in its order that OSAA's scheduling policies adversely affect petitioners, but the board did not make an explicit finding as to the nature or extent of that adverse effect. Specifically, the board acknowledged that "participation" in interscholastic sports is an "important part of the educational process" and is "important to all students who, like plaintiffs here, undoubtedly derive uncalculated [*sic*] benefits from such competition."[22] The board also found that, under OSAA's written policies, schools that enter a tournament are deemed to certify that the teams and individuals representing them "will participate in every game or competition" in the tournament. The board then analyzed whether OSAA could "reasonably accommodate" petitioners' religious beliefs by altering its policies to avoid a conflict with petitioners' religious beliefs.

The board's order thus suggests that OSAA's policies in effect pose a complete barrier to petitioners' participation in the tournament, one that arises because of petitioners' religious beliefs. On review, the parties likewise appear to assume that OSAA's policies have that effect. The board may have considered such a finding to be implicit in its other findings, or may have concluded for other reasons that an express finding on the point was not necessary. *See Montgomery*, 188

---

[22] In acknowledging the importance of student participation in athletic competitions, the board quoted from, respectively, *Whipple v. OSAA*, 52 Or App 419, 423, 629 P2d 384, *rev den*, 291 Or 504 (1981) and *Cooper v. OSAA*, 52 Or App 425, 438, 629 P2d 386, *rev den*, 291 Or 504 (1981). The legislature's recognition of the value of student participation in athletics is reflected generally in the nondiscrimination provisions of ORS 659.850. That recognition is also reflected in the fact that the legislature has declared student participation in interscholastic activities to be a "right," one that extends to privately schooled and home schooled students as well as those who attend public schools. *See* ORS 339.450 (limiting grounds on which private and public schools may deny students the "right" to participate in interscholastic activities); ORS 339.460(1) (ensuring home schooled students the opportunity to participate in all interscholastic activities as long as the student meets certain eligibility criteria); ORS 339.460(2)(c) (defining "interscholastic activities" to include athletics).

Or App at 71 ("It is clear from the board's findings that, without some accommodation of [petitioners'] religious obligations, OSAA's policy will have a direct impact on [their] ability to participate in the Class 2A basketball tournament."). The board should, however, expressly identify in what way OSAA's policies are adverse to petitioners.[23] If OSAA's policies operate to exclude petitioners from any participation in the tournament, and do so because of their religious beliefs, that adverse effect falls well within what concerned the Court in *Griggs* and what the legislature intended to reach by incorporating *Griggs*'s disparate impact theory of discrimination in ORS 659.850. If the adverse effect of OSAA's policies is something other than a complete barrier to participation in the tournament, the board should identify that effect.[24] Such a finding is a predicate to the disparate impact analysis that ORS 659.850 requires.

Second, and equally fundamental, the correct test under ORS 659.850 is more demanding than the *de minimis*

---

[23] We do not suggest that the board cannot make such a finding on this record. Our problem is that the board's findings do not specifically address the actual impact on petitioners, and the board's findings arguably point in more than one direction. On the one hand, the board found that OSAA traditionally has not interpreted its no forfeiture or withdrawal policy to apply to any decision that PAA might make to forfeit a game scheduled on its Sabbath, "because PAA intends to win all of its games and hopes to avoid a forfeit." On the other hand, the board found that OSAA changed its written policy in December 2002 to declare that, by entering into a tournament, a school certifies that its teams and individual competitors will participate in every game the school is scheduled to play. The board further found that PAA could not forfeit or withdraw from a tournament game without violating OSAA's 2002 policy. Under OSAA's written rules, forfeiture or withdrawal is a sportsmanship violation and subjects a team to penalties. Finally, the board found that a forfeiture to honor one's religious beliefs is not exempt from OSAA's policy.

[24] We note, in that regard, that the board found that OSAA is not willing to schedule athletic events on Sundays. The board further found that, whatever the historical reasons for that policy, OSAA now adheres to it for religion-neutral reasons. The fact that OSAA does not intentionally differentiate between individuals who observe different Sabbaths does not foreclose petitioners from urging that OSAA's policies have a differential impact on athletes who observe different Sabbaths. Disparate impact discrimination is concerned with neutral "fair in form" policies that create preferential effects, at least when that impact is the flip-side of adverse impacts on protected groups. *Griggs* expressly made that point by declaring that the disparate impact test that it announced, in addition to reaching intentionally differential treatment, also extends to neutral practices that "operate to 'freeze' the status quo of prior discriminatory employment practices." *Griggs*, 401 US at 430.

burden test that the board applied. That difference is illustrated by examining the board's analysis in its order. The board considered the several goals that OSAA seeks to advance in scheduling those policies, such as maximizing revenue, maximizing participation by athletes and attendance by fans, minimizing expenses to fans and participants, minimizing loss of school time, and maximizing attendance at girls' games. As that list suggests, OSAA's goals are often competing ones. Generating revenue, for example, is at odds with holding down ticket costs; minimizing student time away from school is at odds with maximizing opportunities for athletes to participate in the competition. Given the constellation of interests that OSAA strives to further, OSAA necessarily must balance its programmatic objectives in a way that compromises each of them to some degree. As a result, OSAA likely can—and in this case did—identify a potential "downside" to any scheduling change it might make. The board relied on those "downsides" to conclude that each of petitioners' proposed scheduling options imposed an undue hardship in the form of a more than *de minimis* burden on OSAA's interests.

Under ORS 659.850, however, to conclude that a policy having a disparate impact is not discriminatory in operation, it is not enough for the board to find that abandoning or altering a challenged policy will compromise some interest that the entity administering a program or activity is entitled to further. Instead, the board must find that the challenged policy is necessary—at least, reasonably so—to the existence and successful administration of the program or activity involved. To support such a finding, the evidence must demonstrate, in a concrete and measurable way, the relationship between the challenged policy and the success of a program or activity that it furthers. And the board must consider those with reference to the essential objectives that the program or activity serves. In this case, the foremost objective of the tournament is to give students the opportunity *to participate* in sports.

Neither the board's findings, nor the evidence that the board relied on, met that standard. For example, the board found that having all first round games played on the

first day of the tournament (Wednesday) would impose a burden on some of the participants in the tournament. To support that finding, the board relied on evidence that a "number" of school principals have "voiced concern" about the loss of an additional day of school time for some of the teams. However, the board made no findings (and no evidence establishes) what consequences would follow if all students participating in the tournament, rather than just those who would otherwise have been scheduled to play on Wednesday, lost that day of academic time. Similarly, the board found that OSAA might incur added expense if it secured a second venue so that an additional game could be played after sundown on Saturday (thus permitting any game that PAA might have to play during the day on Saturday to be moved to that later time). But the board did not find that OSAA in fact would have to incur added expense.[25] Nor did the board quantify the added expense or find that, relative to the overall cost of the tournament, the expense was so great that it would jeopardize OSAA's ability to hold the tournament.

In its order, the board made extensive factual findings and explained its reasoning in detail. But because the factual record may develop differently on remand, a more exhaustive discussion of the board's findings and reasoning at this juncture is not warranted. Again, to provide the board with guidance on remand, we offer the above examples of how the board's findings—and the evidence that the board relied on to support them—fail to meet the test required by ORS 659.850. Because the board applied the wrong legal test in its analysis, its analysis misses the mark. The board must reconsider this case—and reopen the record if necessary—pursuant to the "reasonably necessary" test that ORS 659.850 requires, and it must make findings consistently with that test.

---

[25] To the contrary, the board affirmatively found that OSAA had never explored with the host for such a venue (which likely would be a public high school) the possibility that OSAA could not be charged if it did not have to use the added venue. The board also found that, in past years when PAA had been in the tournament, gate receipts (which are OSAA's main source of income for the tournament) were "substantially above-average" than in years when PAA did not play. The board's findings thus leave us to speculate as to whether there would be a net increase to OSAA's costs and, if so, the effect of that increase on OSAA's ability to hold the tournament.

## C.  *OSAA's constitutional arguments*

We turn, finally, to OSAA's constitutional arguments. As we have described, OSAA presented evidence, and the board found, that petitioners' proposals for rescheduling tournament games to avoid the religious conflict for petitioners risked burdening third parties by, among other things, potentially inconveniencing other athletes and spectators or increasing ticket prices for the games. Relying on those findings, OSAA urges that, to the extent that altering the tournament schedule to avoid that conflict imposes more than a *de minimis* burden on third persons who do not share petitioners' religious beliefs, the accommodation violates the Equal Privileges and Immunities Clause of the Oregon Constitution (Article I, section 20) and the Establishment Clause of the First Amendment to the United States Constitution. OSAA's arguments in those regards are sufficiently without merit that we answer them summarily.

### 1.  *Article I, section 20*

■ ■  Article I, section 20, of the Oregon Constitution declares: "No law shall be passed granting to any citizen or class of citizens privileges, or immunities, which, upon the same terms, shall not equally belong to all citizens." The provision is "a guarantee against unjustified denial of equal privileges or immunities to individual citizens" as well as a guarantee "against unjustified differentiation among classes of citizens." *State v. Clark*, 291 Or 231, 239, 630 P2d 810 (1981). As we understand it, OSAA's theory is that, if persons who do not share the petitioners' religious beliefs are burdened in more than a *de minimis* way by any changes that OSAA might make to the tournament schedule, then petitioners are being accorded a "privilege"—that of dictating how the tournament is scheduled—that does not belong on the same terms to others.[26]

---

[26] OSAA is a state actor for constitutional purposes. It is a "voluntary organization" that administers "interscholastic activities" pursuant to authority delegated by the board. ORS 339.430. Under the board's rules, such an organization administers interscholastic activities "for Oregon public schools" and is subject to the board's oversight. OAR 581-021-0034(1)(c). OSAA is thus a state-approved entity that oversees publicly financed activities that are, as a matter of state policy, considered integral to the students' educational experience. *See* OAR 581-021-0034(1)(b) (defining "interscholastic activities" as "[a] public school activity with

■ OSAA's argument misidentifies the "privilege" accorded *by the statute*. ORS 659.850 provides that "[n]o person in Oregon shall be subjected to discrimination in any * * * interschool activity" based on certain protected criteria. The statute thus extends protection to all persons from discrimination on any of several bases, including ones that all persons share in common (age, national origin, race, marital status, sex). The inclusiveness of the statute's protection against discrimination means that the statute *does* convey an equal benefit to others—all persons in Oregon are entitled to be free from enumerated types of discrimination in an educational setting. We fail to see—and OSAA does not adequately explain—how the policy of nondiscrimination embodied in ORS 659.850 reflects a legislative choice that violates Article I, section 20, of the Oregon Constitution. *See generally MacPherson v. DAS*, 340 Or 117, 129-30, 130 P3d 308 (2006) (to complain that a statute accords a special privilege or status to others, or treats them disparately without legitimate reason, the persons complaining must qualify as a class who share common characteristics that exist apart from the criteria on which the governmental choice is made).

## 2. *The federal Establishment Clause*

■ OSAA similarly argues that altering the tournament schedule to avoid conflict with petitioners' religious observance, if that is what ORS 659.850 requires, violates the federal Establishment Clause[27] to the extent that any alteration

---

optional student participation which complements the curriculum, encourages students' physical, academic or social development, is supervised by school personnel and generally is conducted outside the instructional day"). Finally, as the record in this case establishes, OSAA is composed of predominantly public schools and its governing body consists of school administrators. Given the source of OSAA's authority, the scope of its responsibilities, and the composition of the organization, it qualifies as a state actor for purposes of the state law principles involved in this case. OSAA also qualifies as a state actor for purposes of the federal constitutional principles that we discuss later in this opinion. *See Brentwood Academy v. Tennessee Secondary School Athletic Assn.*, 531 US 288, 295-302, 121 S Ct 924, 148 L Ed 2d 806 (2001) (concluding that analogous Tennessee organization is a state actor for purposes of federal analysis). The Court of Appeals so held many years ago. *Josephine Co. Sch. Dist. v. OSAA*, 15 Or App 185, 195, 515 P2d 431 (1973).

[27] The First Amendment to the United States Constitution provides, in part: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof[.]"

imposes more than a *de minimis* burden on others. At least one answer to that claim is that, insofar as a change to OSAA's policies would equalize athletic participation opportunities for those with differing religious beliefs (*i.e.*, not require any participant to play on his or her Sabbath, regardless of whether the participant observes a Sunday Sabbath or a Sabbath beginning at sundown Friday and continuing through sundown Saturday), that choice furthers, rather than violates, the values served by the Establishment Clause. *See generally Widmar v. Vincent*, 454 US 263, 274, 102 S Ct 269, 70 L Ed 2d 440 (1981) (equal access to a broad spectrum of groups, both secular and religious, implies no imprimatur of governmental approval of religion).

Beyond that, although the correct test under ORS 659.850 is not the same as that required for reasonable accommodation of religious beliefs under Title VII, the Establishment Clause jurisprudence concerning religious accommodation answers OSAA's argument. The United States Supreme Court has "long recognized that the government may (and sometimes must) accommodate religious practices and that it may do so without violating the Establishment Clause." *Hobbie v. Unemployment Appeals Comm'n of Fla.*, 480 US 136, 144-45, 107 S Ct 1046, 94 L Ed 2d 190 (1987). Such accommodations are not required to " 'come packaged with benefits to secular entities.' " *Cutter v. Wilkinson*, 544 US 709, 724, 125 S Ct 2113, 161 L Ed 2d 1020 (2005) (quoting *Corporation of Presiding Bishop v. Amos*, 483 US 327, 338, 107 S Ct 2862, 97 L Ed 2d 273 (1987)). On the other hand, as the Supreme Court has also recognized, the accommodation of religion is a principle with limits. *Board of Ed. of Kiryas Joel Village School Dist. v. Grumet*, 512 US 687, 706, 114 S Ct 2481, 129 L Ed 2d 546 (1994). A religious accommodation must be "measured" so that it does not "override other significant interests." *Cutter*, 544 US at 722. Close questions are therefore presented where an accommodation requires infringement of the legally protected rights or interests of private persons or entities; the requirements of the federal constitution in such cases are far from clear. *See, e.g., Hardison*, 432 US at 69-70 (Title VII does not require employer to accommodate employee's religious beliefs where to do so

would interfere with workplace rights of other employees in bona fide seniority system under collective bargaining agreement; Court therefore did not decide whether Establishment Clause principles would be violated by such an accommodation).

■ The requirements of the federal Establishment Clause in this—or perhaps any—context cannot be reduced to a simple verbal formulation, such as a declaration that the clause is violated whenever an accommodation for persons with religious beliefs involves more than a *de minimis* burden on others. We therefore reject OSAA's position that the federal Establishment Clause requires the board to apply a *de minimis* burden test. The analysis required by the Establishment Clause is qualitative, not quantitative. *See Lemon v. Kurtzman*, 403 US 602, 612-13, 91 S Ct 2105, 29 L Ed 2d 745 (1971) (Establishment Clause analysis considers whether governmental action has a secular purpose, a neutral effect on religion, and avoids governmental entanglement in religious matters). In this case, the burdens that OSAA asserts may be imposed on other tournament participants and fans if OSAA alters the tournament schedule—*i.e.*, possible ticket price increases, inconvenience in securing the best seats for the tournament—do not involve legally protected rights or interests of private parties. Nor does changing OSAA's policies so that petitioners may play in the tournament without conflict with their religious beliefs entail any government sponsorship or entanglement with religion that violates federal Establishment Clause principles. OSAA's arguments to the contrary are without merit.

The decision of the Court of Appeals is affirmed. The order of the Oregon State Board of Education is reversed, and the case is remanded to the Oregon State Board of Education for further proceedings.